Our final case of the morning is Underwood v. Royal, No. 16-6262. Counsel, if you are ready, you may proceed. Thank you, Your Honor. May it please the Court, my name is Sarah Jernigan, and I represent the appellant petitioner in this matter, Mr. Kevin Underwood. Booth v. Maryland has made clear now for decades that victim impact evidence, specifically sentencing recommendations, just cannot be upheld because they do nothing other than inflame the passions and prejudices of the jury and divert it from its duty. The specific language from Booth says it's simply their emotionally charged opinions. Now that we have the bossy case, we finally have all parties in this matter agreeing that this is an open and obvious constitutional error in this matter. And so I stand before you today saying that we are deserving of relief for this very issue, and that is that two victim recommendations were both asked and recommended that death be given in this case. Could I ask you, you make an argument for structural error, and you also cite to footnote 9 in Breck for more of an automatic reversal for the Booth violation. Are you aware of any other cases in which the petitioner has argued that a Booth violation should result in reversal based on footnote 9? There, I believe, Your Honor, there have been some additional cases. I know that the State cites to, like, the Duckett and the Hooper case and say that that is not, that those cases are against us in the sense that they have said that Breck's footnote 9 does not apply in this situation. However, I would say that those are easily distinguishable. If you look at, for instance, the Duckett case, that was involving a single prosecutor's misconduct in that matter. It had nothing to do with the victim recommendations and for sentencing relief or sentencing here. And so, while here we are dealing with a systemic problem, like I said, Booth is something that has been crystal clear for close to 40 years now. And it is something that, frankly, the Oklahoma Court of Criminal Appeals has thumbed its nose at. Well, counsel, I mean, this court has consistently recognized the Booth issue. And the footnote 9 possibility has been here before or could have been presented before, even before Bossie. And so, my question is whether this is a fresh issue for this panel or whether there's some history here that would constrain the panel from looking at the footnote 9 argument that you're making. I would say that there is no constraint to this court at this point. If you, Your Honor, if you would refer to the DeRosa case. In that case, Lucero from this court made a dissent but said that one can make a strong case that the state court's system pattern of ignoring the United States Supreme Court should be immune from harmless error review as akin to structural error. Well, that was a dissent. The question is, has the issue been presented and has it been addressed by this panel? It has not been directly addressed, Your Honor. But I would take note of the dissent in that matter that I referenced in the DeRosa case. The only thing that seemed to preclude the panel at that point from granting some sort of relief akin to structural error is it said, previous to that statement that I just cited, it said that we're the option not foreclosed by precedent. And that precedent was referenced as the Arizona versus Fulham State case. But we have the United States Supreme Court specifically saying in the Gonzalez versus Lopez case that Arizona versus Fulham State is not the only test by which we are to measure structural error. Again, opening the door for this court to be able to rule under footnote 9 of Brecht that this is deserving of structural error. We have a systemic issue here, and that is likened to what footnote 9 has provided open for this court. If we can move on to, if we need to do a Brecht analysis, would the evidence of Mr. Underwood's plans to molest and decapitate the victim be relevant to the Brecht analysis? No, Your Honor. I would argue that it's not. Again, part of why Mr. Underwood talked about these things is because of his significant mental illness. He has Asperger's. It is something that he. Well, now, that, why wouldn't it be relevant? Because those are not the actual acts that occurred. But there was evidence that that was the plan. Why wouldn't it be relevant? Because, again, we may all have plans in the commission of a crime, but if it is something that has not been carried forward, it's not the actual crime itself. It was partially carried forward. There were certain limited circumstances that were carried forward, but, however, there was significant information that he delivered in his confession that simply there is no evidence or even allegations that he carried forward. It seems to me you're making not so much an argument that it's totally irrelevant. It seems like your argument is more one of weight. But to say that it's irrelevant, there was evidence that was his plan and there was some evidence that it was going to be carried forward, why wouldn't that come in to the Brecht analysis? Because the jury is supposed to make a determination of whether or not this evidence was substantial and injurious. I mean, that's what we're talking here under the Brecht analysis for the victim recommendations. And, again, I would argue that that evidence or that those plans are not evidence. That is not something that was specifically squarely presented to the jurors as specific evidence of his crime. In fact, if you look to the whole of the case, we have the prosecution that goes on and on and makes arguments that were never presented as evidence whatsoever. And those are addressed in some of the other issues that we have before this court. Specifically, the prosecution talks about saying that the 10-year-old victim has been shaved and there's absolutely no evidence. Let's stick with Brecht for now. And as part of that, there would be the mitigation evidence, correct? Yes, Your Honor. All right. Could you just, without going on too long, tell us the strongest components of the mitigation case? I think in the mitigation case, we have first and foremost that this is a significantly mentally ill individual. In fact, it's something that the State's own experts at trial did not contest any of the defense experts' diagnoses in this case. It is something that unanimously both the State and the defense agreed that this is a significantly mentally ill man. We also have the fact that the jury specifically struck down the continuing threat aggravator. We have an individual who has had absolutely no prior record of any sort of misconduct or illegal activity whatsoever. And we also have, you know, the State has argued that this is a conscientious jury. And I would submit that that is true. We have a jury that looked to all the evidence and still found that continuing threat was not relevant to this case. And so I would certainly assert that, you know, the mental illness that we have in this case, the lack of continuing threat in this matter, certainly would be. I would also say that part of the Brecht analysis, part of the weighing in here needs to be viewed in the sense that this is probably, at least with respect to sentencing, certainly not with respect to guilt. But this was a fairly close case. We have a jury that sent out a note specifically requesting additional information about life without parole. Even after receiving information from the court on that, they still don't make an automatic decision. We also. I feel like the Dodd case, there was just one sentence from each of the parents. And I don't see how one sentence can totally infect the entire proceeding when everything was so overwhelmingly in favor of guilt. Absolutely, Your Honor. But I would refer you specifically refer to the Dodd case. If you look at the language in the court's opinion from there. It was a drumbeat. I remember that case well. It references a drumbeat. But if you look at the. This was maybe, I don't know what you'd call it, but it was just two sentences. It was two victims that testified. But if you look to Dodd and what the victims actually said in that case as well, they are very concise. They do not go on and on. It may have been a drumbeat in the sense that there were additional victims. But the victims in the Dodd case were very concise in their statements. I would say it likened exactly to the victims in this case. They did not go on and plead and have this merciful, you know, dialogue with the court. Instead, it is one sentence statements that the victims in Dodd say as well. And I would also argue that. So it's not just a matter of how long the sentences were that these victims gave. But it's the fact that the prosecutors wanted to have these recommendations given to the jury. I mean, the prosecutor in this case was given a warning by the trial court saying this is not looked favorably upon. You risk reversal. And they decided to proceed ahead with that regardless. And I would specifically point that. Well, but the prosecutor didn't rely on the victim impact statements in closing argument, did they? The prosecutor did reference, at least to some degree, the victim impact. No, no. Did they specifically talk about the statement and the sentencing recommendation in closing argument? They don't specifically cite to the recommendations, but they do specifically go on. Did the prosecutors in Dodd, what did they use in closing argument? I believe they did something similar to this case in that they referenced wanting justice for the family. Well, in Dodd, there were six out of eight witnesses that all recommended the death penalty. I mean, is everybody but the cook. Yeah, but, I mean, I would have trouble believing that this court's analysis is going to be limited to how many family members an individual victim has. I mean, we have two parents here, but you can't get more sympathetic than two parents of a 10-year-old. Let me test that. Here, as your exchange illustrates, there were very brief comments from the mother and father, but it was really more than that. As I understand it, the district judge said, I want to see in writing the questions and I want to see in writing the answers. I don't want anybody deviating from the script, which is pretty unusual. I don't want to hear any emotion. I don't want any crying. And I may be misremembering, but I think the judge even said if there's any emotion, it's over. And so you have on its face powerful evidence, but it's sort of like reading a deposition in a trial. I mean, they're sitting there with the script. The prosecutor is reading from the script. The mother and father are reading their one-sentence line and with no emotion, presumably. You don't have a video of it, but that was what the instruction was. And so you have that. Yes, on its face, victim impact evidence is terribly powerful, but it's certainly mitigated in this sense. And then you have on the other side, the defendants confessed to cutting a 10-year-old girl's neck, trying to decapitate her, at some point trying to have sex with her, whether she was conscious or dead already or not. And so it's hard to see, well, if this is prejudicial, it's hard to imagine, because of these two lines of these mother and father reading from a script, it's hard to imagine that there would be any situation in which we would, if any court would find that a victim impact evidence, a recommendation of the death penalty, would ever be considered harmless. Your Honor, I would assert that Booth has taken care of that. That Booth specifically says that this type of information does nothing other than inflame the passions and prejudice of the jury. And you specifically reference how graphic and how terrible this case is. And no one's here to say otherwise. But because of that, it makes the victims in this case, the parents, even that much more sympathetic. Well, the latest case from the Supreme Court is, I guess, this Bossie case. Yes, Your Honor. And they, I guess, reprimanded the OCCA a little bit, but they didn't come up with a structural error issue and, you know, just reverse it, period. They reversed it with directions to be consistent with their opinion. But the structural error was not before the court at that point. And we have, you know, law here that specifically, you know, the footnote 9 that's saying that, you know, in Brecht at least, that the holding does not foreclose the possibility that there would be this structural error down the road. And I would argue that even with Bossie. I mean, there's very, very few areas where they've actually said this is structural, period. You're right, Your Honor. But I would argue, again, when you have evidence that the United States Supreme Court has said has no other purpose than to inflame the passions and prejudices of the jury and to divert the jury from their duty, I would say this would fall into one of those categories. And even if it doesn't. Well, but counsel, is that really different from the position that this court has taken on Booth over the years? And there's been this conflict between this court and the OCCA. And the Supreme Court has come in on the side of where this court has been going. But does Bossie really change anything in terms of the law of the Tenth Circuit? It doesn't change anything as far as the Supreme Court law or the circuit law. But I do believe that it is going to take both the Supreme Court and this court saying enough is enough to the Oklahoma Court of Promotions. Given that we have found harmless error under Brecht in a number of cases, wouldn't it take an en banc decision on this court to find structural error? Wouldn't there be some tension with previous panel decisions if this panel were to try to do something like that? I think that there's a potential for some tension there, Your Honor. But I also think that this is a case that does weigh in favor of structural even if the court has previously not found it to be such. I'm just not seeing why this case is different from other cases where that didn't happen. Again, I would assert that because of how graphic this case was, because of how tragic this was, I can't think of a more sympathetic victim than a 10-year-old and her parents who are now asking for death. Because of the facts of this case, because we have a defendant who is significantly mentally ill, and in fact the State has agreed to all of the diagnoses for all intents and purposes, that this is something that it did have that much more of an effect on the jury members. And even if the statements were given in a non-emotional manner, I have trouble believing that as a parent, as a human, as an individual, that a juror would not be persuaded by the parents who have just lost, tragically, a 10-year-old daughter to this. So whether it be for structural error, whether it be for harmless error, we deserve relief in this matter. If we look at the Dodd case again, we've had some discussion this morning about it, but it's not necessarily the drumbeat of the number of victims that give the recommendation. But the court specifically, the Dodd court, looked to whether or not the prosecutors pushed forward for this information. And the prosecutors in this case did so even above and beyond trial court warning them not to do so. Well, let me ask you about that. The prosecutor is in a state, Oklahoma state court. The precedent in that court was that there was nothing wrong with it. Now, our court has said over and over that's incorrect. So has the Supreme Court. And the Supreme Court said that, too. But the precedent for that prosecutor was, much like the state district judge, was abiding by Oklahoma law as defined by the Oklahoma Court of Criminal Appeals. So it's easy for us to sit in judgment, so to speak, and be very critical of that, and maybe even characterize it as prosecutorial misconduct. But it really was nothing of the sort because the prosecutor and the state district judge were, rightly or wrongly, applying Oklahoma laws defined by the Oklahoma Court of Criminal Appeals. I would simply argue that the trial court knew that this should not be allowed in and warned the prosecutor not to press forward with it. And even though it might not be a technical prosecutorial misconduct allegation in this case, the fact is that over 30 years now, the prosecutors in Oklahoma have been able to rely on the Oklahoma Court of Criminal Appeals to flaunt its nose at Supreme Court authority and this Court's authority for that matter. Is it a matter, after Bossie, that this is maybe academic? Maybe it's not academic to your client, but it's certainly not going to be an ongoing problem after Bossie. How do we know that, though, for sure? I mean, it shouldn't have been an ongoing problem after Booth. And it was for 30 years. And yet we're told the Oklahoma Court of Criminal Appeals is told, no, you're wrong. And yes, I would hope that the Court is going to change its pattern of behavior. I would hope that the Oklahoma prosecutors are going to change their pattern of behavior. But they've been able to rely on usurping federal law now for decades. And so I would argue, again, that this certainly is one of those rare circumstances contemplated by Footnote 9 in Brecht that is applicable here as far as structural error. But I would also argue that regardless if it's under a harmless error standard,  if we have, you know, some of the issues that the Court looked to in Dodd were, you know, they mentioned circumstantial evidence. They mentioned the drumbeat of the victims that are recommending this sentence in this case. However, it was a fairly apparent in Dodd that he was guilty. And we have a client here who has a jury who has specifically shot down the continuing threat. We have a sole aggravator. We have a client who has not had any sort of criminal history whatsoever. We have a client who is significantly mentally ill. We have two of the most sympathetic victims that you can possibly think of asking for death in this matter. And so, again, I would argue that whether it be structural or whether it be a Brecht analysis, that we are deserving of relief in this matter. I would like to reserve the remainder of the time for rebuttal. Thank you. Do you mind if I bring my water? I typically need it up here. May it please the Court, my name is Jennifer Dixon. I represent the Respondent. Could you pull the microphone down a little bit there? Good. Thank you. Yes. Is that better? Yes. Okay. I guess I should start where counsel left off and just jump right into the victim impact. Yes. Why don't you tell us what we have to do to get the Oklahoma Court of Criminal Appeals to adhere to Supreme Court and Tenth Circuit authority? You have to do absolutely nothing anymore. At this point, the Supreme Court has spoke and has told states. It spoke before and we have spoken. Now it spoke again. Exactly. And it spoke this time directly to the Court of Criminal Appeals. And it's told the Court of Criminal Appeals, you do not determine if we overrule our cases or not. We do. And the death sentence or death recommendations are not allowed. And so, at this point in time, it's not an issue anymore. I mean, I can't say for sure that we won't have one come up the pipes before, Bossie, but I honestly don't know that we will. I think the issue has been solved and it's been solved by the United States Supreme Court, which is exactly what Judge Lucero suggested needed to happen in his dissent in the DeRosa case. As far as structural error, the Supreme Court is very clear that structural error is few and far between in cases. The structural error has to be a defect that's affecting the framework within which the trial proceedings, rather than simply an error in the trial process itself. And in this particular case, it seems as if truly the request for structural error is based on the fact that the Court of Criminal Appeals, for years, allowed the testimony. And there's no Supreme Court law out there that says that would be a reason for structural error in this type of case. Why couldn't Bossie be read as recognition that there has been systemic Eighth Amendment violations in these cases, and yet we get the Brecht analysis and we're weighing all of this and so forth? Is there a point at which, given that the Supreme Court has now weighed in, that it would be appropriate to revisit footnote nine and say, we're just not going to go down the Brecht weighing road. This just has happened and happened and happened. The Supreme Court has now come in and very clearly said that it's wrong. And so why doesn't that, in and of itself, revive a potential footnote nine approach in this court? Just based on the systemic nature of? No, I didn't say that. I did say systemic, but now the Supreme Court, highest court in the land, has said that the OCCA has been permitting Eighth Amendment violations time and time again. Why isn't that enough to put the footnote nine analysis back on the table? I would argue the footnote nine analysis is, again, reserved for several reasons, I guess. I think in this Court's opinion in Hain, it's really one of the only ones that I could find where it appears based on the footnote in Hain that maybe the structural error argument was raised. And the Court, you know, in Hain talked more about, although Booth didn't expressly indicate whether this was a trial error that would be subject to harmless error review or structural error, the Court's language, I think in other cases, sorry, I'm just looking at this real quick, I haven't looked at it in a while. Nevertheless, we do believe the OCCA unreasonably applied Booth. And so in Hain, this Court actually did speak to a harmless error analysis under Booth. And it said that the Court of Criminal Appeals was reasonable in applying a harmless error analysis. So I would argue that there is some precedent there in this Court already that would say you wouldn't want to go down a structural error analysis for this type of error. Well, you can see why this is troubling, I take it. And yet the State keeps pressing on, even here, even now, in your argument. When you've got a clear Booth violation, Supreme Court would say so. And yet here we are again. I definitely can see that it's troubling, but not to a point of structural error. We have troubling constitutional error all the time. And the Supreme Court has said as long as you have counsel and an impartial jury, basically any constitutional error is subject to a harmless error analysis. So when you're looking at, this is a trial, this is an admission of evidence error. And it's no different than the Supreme Court holding that the admission of a coerced confession can be subject to harmless error review. So I don't, I understand that it's a problem that's been frustrating for this Court. But I don't know that that is a reason that we would subject a trial error to a structural error analysis. It doesn't seem consistent with Supreme Court law at all. And I realize that the fact that the Supreme Court did send it back and did acknowledge that the State has argued that even if it is error, this is subject to harmless error. It's harmless. The Supreme Court said that's a matter that the States can take up. If this is harmless error or not. Now, I'm not saying that that is a holding that it's not structural. But then you have the U.S. case. Well, I guess that really wasn't my point. It just seems like now the Supreme Court waits and the State of Oklahoma is still up here trying to defend this Booth violation. Your Honor, I'm not trying to defend the Booth violation. I'm trying to defend the fact that this is not a structural error. I didn't say structural error. You wanted me to revisit 509. About three minutes ago, I did. But that isn't the question I'm posing to you. I'm just saying, why are we here again after the Supreme Court has already, has recently weighed in? Well, this issue, in this case, it was before Bossie. I mean, we're here on this. But now it's after Bossie and here we are. Right. Well, I mean, this was a COA that was granted, you know, late in the game. And I'm guessing it was granted because of Bossie. But, I mean, I'm here to defend the fact that this is subject to harmless error. I'm here to defend that these two brief recommendations that are nothing like the Dodd case are, did not have a substantial injurious effect on the outcome. I mean, I have to come in here and defend this alleged error because it doesn't rise to a level of structural error. Well, it's not an alleged error either. No, the error. You're absolutely correct. And there's no doubt the state of Oklahoma has allowed this type of evidence. I'm not defending that here. And if I'm coming across that way, I'm not trying to come across that way. What I'm saying, what I am arguing, though, is this is not structural error. Structural error is limited, few and far between. But you're also arguing it's not a harmful error either. I'm arguing that it's, yes, that it's not. Well, let's hear your argument on that. I think that this Court's factors that were listed in Dodd, which the district court correctly applied, is what should be talked about. These two statements, they were question and answer format. It was what is the appropriate punishment? And the answer was the death penalty. That was from the father. The mother's was the death penalty, he took my little girl, I think. That is not at all what you have in Dodd. Dodd's were quite a bit more than that. I have a few of them here, but they were, they had statements as well. They didn't just give a, it wasn't just question and answer format. And it was, one was the defendant has been found guilty. His eternal consequences are out of your hands, but his earthly consequences are in yours. I believe the appropriate sentence for the defendant is death. That's one. I would ask you give the defendant the death penalty. That's two. I believe the death penalty is the appropriate sentence for this man. The mother testified the only one appropriate punishment I can think of that he should be put to death. The next one, I believe the appropriate punishment should be death. He needs to die. I think the death penalty would be appropriate for this case. So, you had some that were merely a sentence, and you had some that had a lot more emotion in it. And again, it was a drumbeat. And in this particular case, you had two witnesses. The testimony, the victim impact testimony was probably the, for lack of, it just wasn't very, it was not compelling. It was a question-answer format. Why should your, why should Jamie not have been killed? What do you think the appropriate punishment is? So, counsel, in this case, Mr. Underwood had, in the mitigation case, 19 witnesses and identified 11 mitigating circumstances. Dodd had seven witnesses and two mitigating circumstances. So, why isn't the mitigation case here stronger than in Dodd and point to Brett Karmfuller? I think a number of witnesses here really can't, I mean, regardless of how many they were in Dodd, the nature of this mitigation case was not that compelling. You do not have, there's no physical or sexual abuse. You had some, I want to say verbal abuse claimed by maybe the father. You're talking about Dodd right now. I'm talking about Underwood. Well, there sure was. There was no physical or sexual abuse in this case? To Mr. Underwood? No, not to him. To the victim. Oh, to the defendant. To the defendant. Yeah, I thought we were talking about mitigation. I thought you wanted me to talk about mitigation evidence. Well, I do. I wasn't clear on what you were. So, now you're talking about Underwood and not Dodd. Right. All right. Go ahead. I'm sorry. No, well, I thought you wanted me to say why Kevin Underwood's mitigation was not more substantial than Dodd's because Kevin Underwood had more witnesses. What I'm telling you, his mitigation witnesses were not compelling. This was not an overly compelling case in mitigation. Three of the witnesses were experts, and the testimony that they gave was to refute continuing threat, but a lot of it was also, it was aggravating. The several, the testimony of his sexual deviancy due to all the paraphilias. I mean, there was a lot of evidence in his mitigation that likely wasn't very mitigating. They called teachers. They called family. They called friends. He was a nice guy. He did well in school. He got bullied. There was mitigation in this case, but it is not compelling mitigation. And if you, when you look at his mitigation case, it doesn't even compare to the case in aggravation. And I understand it's a one aggravating circumstance case, but it's especially handicapped versus cruel. And the evidence in that, of that aggravator was probably times ten of anything we ever see in state court for this particular aggravator. There was no way around the fact that she How are we supposed to evaluate what you just said? About the enormity of the aggravating circumstances? How do we know what times ten refers to? I mean, isn't it just a matter of looking at the evidence? Yes, and I apologize for using that terminology. The reason I say that is just, it was just an overwhelming amount of aggravation in this case. And when you're looking at the quantity and the nature of these recommendations, they were very small, very unemotional. The trial court was very strict with this case. There's no question of guilt. It was a circumstantial case in Dodd. In this particular case, it is not. We have a confession, a very graphic confession. So at the end of the day, when you look at the factors in Dodd, it just, there's no way these single requests for the death penalty had a substantial injurious effect on the jury's determination of death. Unless this Court has other questions about victim impact or if there's any other issues you'd like me to address, counsel hasn't, she's reserved for rebuttal, but I feel like I've got a question about the ineffective assistance issue. Yes. Correct me if I'm misreading this, but it seems to me your argument on the ineffective assistance issue as to whether Dr. Adams' testimony might have made a difference seems to be tied to the HAC aggravator. But wouldn't Dr. Adams' testimony also serve, potentially have served the broader purpose of countering Dr. Jokub's suggestion that the victim may still have been alive when Mr. Underwood was cutting her on the neck? I guess what I'm saying is it seems to me you're limiting your argument to the HAC aggravator, but doesn't this, wouldn't that testimony have been relevant, have broader relevance? In second stage proceeding, Your Honor, I don't know how it would have any... Well, second stage incorporated the guilt phase, so... Right. So I don't think that's the answer. No. What I'm, I'm just, as far as relevancy, I would say that Dr. Adams had zero relevancy in first stage. This was a clear-cut case of guilt. They didn't even argue it. I'm asking whether it would have been relevant, whether it would have been relevant beyond the HAC aggravator. No, I do not think it is, Your Honor. I do not think it is. The only relevancy that they have talked about for his testimony is that it would refute any notion that Dr. Yacoub may have... Dr. Yacoub could not say whether she was alive or dead with certain wounds. The body was moved. There was no crime scene photos. And so her examination of the body was that I cannot make a determination whether she was alive or dead. On cross-examination, defense counsel was very successful in getting her to testify that as far as when unconsciousness occurred, she cannot tell you. She does not know when the victim became unconscious. With especially heinous atrocious or cruel, you have three very, very experienced defense lawyers here in capital litigation. To satisfy especially heinous atrocious or cruel, you had to have conscious physical suffering. That was done within the first 20 minutes. Before any of the things that happened to her or after she was smothered, any of that stuff doesn't... You can rebut some consciousness if you want to on those matters, but Dr. Adams' testimony isn't going to rebut conscious physical suffering as a whole in this aggravating circumstance. Well, and that's a big mountain that you just characterized. There's no question that the aggravator was satisfied. The jury found it. And so I don't think anyone is insinuating that Dr. Adams' testimony would have led the jury to say that this was not an especially heinous atrocious and cruel murder. However, there are different gradations of especially heinous atrocious and cruel. And if the jury believed that Dr. Yacoub's leaving the door open, that not only was this little 10-year-old girl strangled, but she might well have been alive when this man started cutting her throat to decapitate her, that could be incredibly powerful. Not necessarily dispositive of whether it was especially heinous atrocious and cruel. Of course it was. But why is it the fact that Dr. Adams would have unequivocally said that would not have happened? Dr. Yacoub is wrong in the sense of saying it's possible. It was not possible. She was not conscious. She was not aware. There was still a horrific thing that happened to her. That's one thing that Dr. Adams could have said. Ladies and gentlemen of the jury, don't ever think that there was an iota of possibility that this little Jamie knew that this man was cutting her throat to decapitate her. That didn't happen. Now, why wasn't that relevant, significant? It would be significant to the weight of the especially heinous atrocious or cruel aggravating circumstance. I don't disagree with that at all. But what trial counsel has to take into consideration is everything else that Dr. Adams would have testified to. He would have been subject to cross-examination. At this stage, these attorneys were trying to save Kevin Underwood's life in second stage proceedings. So the focus on their second stage, if you look at it, is Mr. Underwood told you everything he did. The State paraded a bunch of stuff in here to be prejudicial. They didn't need to parade all this in here in front of you. He told you what he did. You don't need to even go beyond that. That was one of their mitigating circumstances is that he gave a full confession as to what he did. He cooperated with law enforcement. So you have a big part of their second stage case is relying on his cooperation with police and that he was truthful in his confession. The risk of putting Dr. Adams on is Dr. Yacoub, her testimony is not inconsistent with Kevin Underwood's. Hers is inconclusive. I can't tell. I don't know. So what the jury had was I can't tell, I don't know. Defense counsel making it very, defense counsel bringing out on cross-examination that she couldn't determine when she became unconscious. And then Kevin Underwood's own confession. So you don't have any inconsistencies. If you bring in Dr. Adams, you have inconsistencies. Well, you know, in a vacuum, I think you make a very cogent point that this would have returned the jury's attention, their focus, to the gravity of what Mr. Underwood did. But then I've got a question. Well, why did defense counsel cross-examine Dr. Yacoub in the first place? Why did defense counsel try to obtain these admissions from Dr. Yacoub on the witness stand that, well, she might very well have been unconscious or dead when he tried to have sex with her or when he decapitated her? You know, so even if you put aside their counterargument, which is, you know, it was the elephant in the room, the jury wasn't going to forget the gravity of what happened, the defense counsel obviously thought it was important enough to cross-examine Dr. Yacoub on this. And so, you know, particularly when you put in the context of, I don't want to make it too convoluted a question, but Judge DiGiusti didn't grant an evidentiary hearing on this issue. So why wasn't at least an error on the part of Judge DiGiusti not to entertain an evidentiary hearing on the habeas petition to say, okay, you can make that argument that it would have returned the jury's primary focus on the gravity of the harm. It wouldn't have made that much of a dent in what Dr. Yacoub said. They could make the counterargument. But especially with the loss of the inability to have an evidentiary hearing, why isn't that at least some indication that the defense just messed up by not putting Dr. Adams on the stand for this one point? This, well, I don't think it's evidence that the defense just messed up. I mean, they knew he was available for second stage proceedings if they wanted to call him for second stage proceedings. The Supreme Court has said it's perfectly fine to use cross-examination as a tool rather than to call a competing expert. And that is exactly what Mr. Hare did in this case when he cross-examined Dr. Yacoub. The State had to prove beyond a reasonable doubt conscious physical suffering. And, of course, when it came out during direct examination that she was unsure when she was rendered unconscious or not, then that, of course, the defense counsel is going to get up there and ask questions. He does not want to leave that hanging for the jury that she was alive. As a matter of fact, Dr. Yacoub's testimony indicated that, you know, the covering of the mouth and the nose and the deprivation of oxygen is going to render you unconscious if you don't get enough oxygen. She also testified that the food in the airway would render you unconscious because you don't get enough oxygen. So, counsel did exactly what he needed to do with cross-examining Dr. Yacoub just to make sure she, even though she wants to say there's a possibility and he made it clear. You keep saying would have and could have again. Do you know when she became unconscious? And I think he did that because he wanted the jury, again, to focus on what the defendant said. The defendant said, the last time she quit breathing, I made sure she wouldn't breathe again because I put the duct tape over her nose and her mouth. You know, you have evidence of a victim who fought. She fought hard. If she was still alive or conscious when these other acts were happening to her, there's going to be more evidence of her fighting and her fighting him. And he doesn't say any of that in his confession. So, what the defense was doing in cross-examining is bringing it back to Kevin Underwood's confession and letting the jury know he told you what he did. But let me play doubles advocate with that. It also left open the opportunity for the prosecutor, as the prosecutor actually did, to say, Underwood says he confessed. Well, he didn't tell you everything. He didn't tell you of what he did. And this little girl, you heard about that, you know, when he, you know, suggesting to the jury that Jamie might have been aware, based on this little nub that was left open in Dr. Youkoob's testimony, that she was aware, that might have been aware that he was cutting her throat. Not to mention other things. You know, the shaving that Dr. Russell said that her vaginal hair had been shaven, which Dr. Russell said nothing of the sort, neither did the medical examiner. And so, when you say that, well, this is how it would have played, well, that's the kind of stuff you have in an evidentiary hearing, where you might be white. You might have convinced Judge DeGiusti. They might have convinced Judge DeGiusti, but nobody really got to testify. Well, just with the evidence that's here, I mean, if Dr. Adams would have been presented, then that would have, could have fueled that argument with the prosecution. He said he didn't have sexual intercourse with her, but yet, and Dr. Youkoob says, I can't tell if there was any penetration. I don't know. Dr. Adams says, to a degree of medical certainty, there was penetration. So, that would be another, I mean, if he is called to testify, that is what a prosecutor, and especially this prosecutor, is going to look at that difference. And that's not, that's not in this confession. Another thing that I, you've got to look at, too, what Dr. Adams' report said. Part of his reason was, well, the crime scene photos don't show any blood on them, you know, don't show a massive amount of blood anywhere. And if she was, if he tried to decapitate her when she was alive, there would be a massive amount of blood everywhere. Well, the scene was cleaned up. These pictures were taken two days later. So, if that is the reason, then that reason isn't supported by the evidence that he's relying on. Another thing, in regards to that same thing, he says, someone who is alive and their throat is cut, they will bleed profusely. That is exactly what Kevin Underwood said happened in this case. That as he started to cut her neck open, she bled more, he couldn't believe how much blood was coming out of her. He could not control where the blood was going. There was so much of it. So, there were some very harmful aspects with regards to Dr. Adams' testimony. It definitely would have refuted conscious, physical conscious suffering as a whole. So, that aggravator was still going to be there. And it would have taken away from the mitigation. And that, the mitigation is all the defense lawyers had in this case. They had relying on their mitigation to get this jury not to sentence him to death. And they did a great, fantastic job of convincing at least one juror, because it does have to be a unanimous finding, that he wouldn't be a continuing threat because he would be in prison. So, you know, we presume strategy, and in this particular case, the record supports strategy. This is what we have before us. What you subject Dr. Adams to on cross-examination and what you have to lose by detracting from your mitigation was big in this case. And so, the Court of Criminal Appeals finding that this was reasonable trial strategy is reasonable. A fair-minded jurist wouldn't all disagree that they just got it wrong here. And I would like to, just because Your Honor talked a little bit about it, the prosecutor's comments with regards to the shaving. In this particular instance, there is part of his confession. He says when he, after he killed her, he drug her into the bedroom, and he drug her in between the desk and the bed. You have medical testimony that she did, in fact, have pubic hair. You have testimony from Jolene, maybe that was her last name, an investigator, I think, that she observed loose hair in the pubic area. She also described an area as clean. So, I realize there was no testimony from the medical examiner that an area was shaved, but there surely is an inference based on the evidence that this victim was shaved. It's a reasonable inference. The prosecutor didn't say that. The prosecutor said, as I recall, Dr. Russell told you about the shaved, I'm not quoting it because I don't remember exactly, but the prosecutor specifically attributed, actually, it's the medical examiner, said the medical examiner told you about the shaved vaginal hair. Well, the medical, presumably the prosecutor was getting Dr. Russell mixed up with the medical examiner, but neither one of us said anything about shaving. Right. Well, I think his comment was, and that's, what did he not tell you? He didn't tell you that he shaved her with that blue razor right there. And then he starts talking about the evidence that supports that. And you're right. He did say the medical examiner noticed loose hair there. And it wasn't the medical examiner. It was the investigator. So, yes, that was a minor misstatement. But as far as a reasonable inference from the evidence, I do think that it was there. And there's several cases in this Court where you've drawn such an inference. I realize I'm out of time, so I would request that you affirm the denial of release from the district court. Thank you, counsel. Thank you, Your Honors. I would like to speak briefly to the trial IAC trial counsel. And the State just argued that that inconclusiveness that the State urges that both Dr. Adams needed to be called. What if he had testified that in his opinion there was vaginal trauma? That would contradict the defendant. It would make him look like a liar on everything. And why wouldn't that be a reasonable approach to take under these circumstances? These lawyers had not a whole lot to work with. Well, respectfully, Your Honor, I would argue that it doesn't necessarily contradict everything that Mr. Underwood said. Mr. Underwood. He said there was no penetration. He did say that, but. He said there was penetration. But again, I. That's a contradiction. I again would go back to Judge Baccarat's assertion that those are the type of details, those are the type of facts that would need to be uncovered in an evidentiary hearing. We know that Mr. Underwood acknowledged having some sexual contact with her. Yes, there was no penetration according to his testimony. But to have some sort of injuries doesn't necessarily mean that we've had full penetration here. And I know these details get. Well, Dr. Adams would have testified there was vaginal trauma. Vaginal trauma. But that's very different than saying that he had fully penetrated her and that he had done something that he had not already confessed to. Dr. Adams also was going to be able to testify that Dr. Yacoub, she had mentioned having bruising on the cervix and such. Dr. Adams was going to be able to contradict that and say that wasn't bruising, that wasn't what that was. And he would have been able to do that with medical and scientific certainty. And that's not something that Dr. Yacoub was able to testify to. So, again, I would assert that an evidentiary hearing, if there's any sort of question as to what those statements meant, evidentiary hearing was the proper method to get these facts and these details straight. But if those facts don't make any difference, if it was a legitimate, maybe it was wrong, but if it was a legitimate defense decision, why would an evidentiary hearing have any effect whatsoever? There's no evidence. This case was a loser from the beginning. There's no evidence that there was strategy here. And even if it were strategy, I would argue it's simply unreasonable. In fact, the State in lower courts has argued all along that trial counsel did not call Dr. Adams because of scheduling conflict. That's not strategy. Didn't Ellis v. Ramish specifically say that we look at whether there is any reasonable strategy that could have justified what the defense counsel did? I would argue that there is no reasonable strategy here. You have an issue. Again, it's not an issue, and I think you had this dialogue, Judge Bachrach, with the State. But it's not whether or not this type of evidence would have totally blown Hack out of the water. It's allowing the jury to make a determination of the weight of that heinous, atrocious, and cruel evidence. And you have someone that has testified, leaving open the door, that a 10-year-old was alive and even possibly conscious. When these horrific acts happen, that certainly is going to go to the weight. And so what possible trial strategy would there be to prevent that from coming in, especially when you have a report that, yes, Dr. Adams would say that there was some sort of trauma, but we don't know the details of what it would take, how much of an act it would take to cause that trauma. And again, I would argue that that's a detail that needs to be figured out in an evidentiary hearing that we've asserted previously is demanding in this case. And so I would say there's simply no reasonable trial strategy. It's not just some incantation of strategy that trial counsel can assert. It must be a reasonable strategy, and we don't have that here. And you asked for an evidentiary hearing in the district court? Yes, Your Honor. The only other thing I would say is going back to the previous issue that we've had a dialogue about this morning, about the proper impact testimony, is even if we put the structural error aside, we're still under a Brecht analysis. And under the Brecht analysis, the petitioner does not bear the burden of proving harm. And in fact, if we're even at a margin, we win. And if you look at everything here, and again, I would ask that you would look closely at Dodd. I would say that the type of circumstances that were available in Dodd, we have at least as weighty of circumstances here that would weigh in favor of saying that this was a harmful error. Does the State have the burden on the Brecht analysis? I would say that, yes, Your Honor, that they would. If it comes down to who has the burden, it is certainly not the petitioner, so it would be the State to approve. I see that I am running out of time, but certainly if you have any other questions, I'm available to discuss those. I have one. Go ahead. I just have one question. In terms of going back on whether there was a reasonable trial strategy, you know, a lot of very skilled trial lawyers take the approach that what you want in a civil or criminal case, the winning side is going to define the issue that the jury talks about in the deliberation room. And you have, by all accounts, and you acknowledge it, a very horrific crime. If the jury is going to go back and talk about whether this was a horrible crime, whether he shaved the vaginal area or whether the girl was alive or conscious when he started to cut the throat, the defendant is going to get the death penalty, if that is what the 12 jurors are going to be talking about. If the jury is going to be talking about the fact that, yes, this was a horrific crime, but this guy had a terribly, you know, distressed childhood. He was mentally ill. Only healthy people don't do that. Then you've got a chance to spare this guy's life. So why isn't it, even though it might sort of mitigate the gravity of the hack, about if Dr. Adams would have testified about that one aspect, why isn't it a reasonable trial strategy to say, look, I've got to cross-examine Dr. Yacoub at this point. I don't have any choice. I want to make it hopefully five minutes or less, and I want to sit down, and that's the last time I want to talk about the gravity of this harm, as opposed to in the defendant's case-in-chief in Stage 2 saying, okay, well, now I'm going to call Dr. Adams, and I want to broach this whole subject of the gravity of the harm. So why isn't it a reasonable trial strategy to say, yeah, I can escort some points, but I am of the – I, the trial lawyer, am of the school that that's not what I want the jury talking about, you know, and I don't have control over a lot of things, but I have control over what I do in my case-in-chief. It's a long-winded way of saying why isn't that a reasonable or could be a reasonable trial strategy. I would say, Your Honor, because the prosecution, the winning side, as you referred to them, we all knew that this was going to be a mitigation stage case. It was clear that he was guilty. He confessed to this. And so the prosecution made sure that the jury would have these details in their mind when they went back for sentencing. All the evidence, I think, Your Honor, that you referred earlier, all the first-stage evidence was incorporated into second stage. We have a conscientious jury who is going through all of these details as they make this determination. And so to try to step away from these facts, I mean, these type of facts are with us. I mean, this is not something that you can just turn a blind eye to. And especially when you have left open the possibility that a 10-year-old is alive or even possibly conscious, that must be nailed down. I see I'm out of time, Your Honors. I apologize. I would just simply assert that we request relief in this case for these errors. Thank you. Thank you, counsel. Thanks to both of you, counsel, for your arguments this morning. The case will be submitted and counsel are excused. And this Court will stand in recess. Thank you.